**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**MARGOT CLEVELAND,**

Plaintiff,

v.

**CITY OF DEARBORN, MICHIGAN; ABDULLAH H. HAMMOUD,** individually and in his official capacity as Mayor of the City of Dearborn, Michigan,

Defendants.

No. ____________________

**COMPLAINT**
[42 U.S.C. § 1983]

Plaintiff Margot Cleveland ("Plaintiff"), by and through her undersigned counsel, brings this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof alleges the following upon information and belief.

## INTRODUCTION

1. "[T]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The U.S. Supreme Court has long held that government "may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite." *Epperson v. Ark.*, 393 U.S. 97, 103-04 (1968). Indeed, "no official, high or petty," including the Mayor of the City of Dearborn, "can prescribe what shall be orthodox in politics, nationalism, religion or

other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). For too long, the City of Dearborn has been a hostile place for Christians and Jews. Defendant Hammoud has taken this hostility to the next level, openly conveying the message that Christians and Jews are not welcome in the city and are, indeed, second-class citizens.

2. The City of Dearborn ("City" or "Dearborn"), through its officials and those acting on behalf of the City, has a history of discriminating against Christians and those who do not adhere to Islam, resulting in litigation in which the Christians inevitably prevailed. *See Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) (striking down a restriction on a Christian pastor's right to distribute religious literature during the Arab festival held in the City of Dearborn); *Acts 17 Apologetics v. City of Dearborn*, No. 11-cv-10700, 2012 U.S. Dist. LEXIS 197041 (E.D. Mich. Feb. 7, 2012) (denying the City's motion to dismiss the lawsuit filed by Christians who alleged that they were unlawfully arrested for evangelizing during the Arab festival held in the City of Dearborn, prompting a City apology and a settlement payment of $300,000 to the Christians); *Bible Believers v. Wayne Cty.*, 805 F.3d 228 (6th Cir. 2015) (en banc) (holding that law enforcement violated the constitutional rights of Christians at the Arab festival held in the City of Dearborn). Despite these legal defeats, nothing has changed in the City.

3. This civil rights action is brought under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, challenging Defendants' acts, customs, policies, practices, and procedures that have deprived Plaintiff of her rights protected by the First and Fourteenth Amendments to the United States Constitution.

4. Plaintiff seeks a declaration that Defendants violated her clearly established constitutional rights as set forth in this Complaint; an injunction enjoining Defendants' acts, customs, policies, practices, and procedures that favor Muslims and discriminate against Christians and Jews as set forth in this Complaint; nominal damages; and an award of costs and attorneys' fees under 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

6. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure. Plaintiff's claims for nominal damages are authorized under 42 U.S.C. § 1983.

7. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

8. Plaintiff Margot Cleveland is an adult citizen of the United States and a resident of the City of Dearborn, Michigan since 2007. Plaintiff is an award-winning journalist whose work includes public commentary and reporting on government conduct, including the conduct described in this Complaint, and whose ability to petition, criticize, and report on the Mayor's and the City of Dearborn's conduct is protected by the First Amendment. Plaintiff is also a taxpayer who objects to her taxes being used to promote Islam and discriminate against Christians and Jews.

9. Defendant City of Dearborn is a municipal entity organized and existing under the laws of the State of Michigan. It is a municipal corporation with the right to sue and be sued.

10. Defendant City of Dearborn is responsible for the customs, policies, practices, and procedures of its Mayor's Office, Law Department, and City Council described in this Complaint, and for the acts of its officials taken pursuant to those customs, policies, practices, and procedures.

11. Defendant Abdullah H. Hammoud ("Mayor") is the Mayor of the City of Dearborn. At all relevant times, he was acting under color of state law. Defendant Hammoud is responsible for the executive actions, customs, policies, practices, and

procedures of the City of Dearborn as described in this Complaint. Defendant Hammoud is sued individually and in his official capacity.

**STATEMENT OF FACTS**

12. While picking up a pizza for dinner in downtown Dearborn in or about April of 2025, Plaintiff, a legal commentator and journalist who regularly writes on constitutional and civil rights issues, discovered that the City had placed numerous banners on public property, proclaiming "Ramadan Kareem," which translates in English to "Generous Ramadan."

13. Ramadan is the ninth month of the Islamic calendar, observed by Muslims worldwide as a holy month of fasting and prayer. It commemorates the revelation of the Qur'an to the Prophet Muhammad and involves fasting from dawn until sunset. The participation in Ramadan is an Islamic religious exercise.

14. During her downtown visit, Plaintiff also saw that the City had erected a large lighted crescent moon, which is an Islamic religious symbol, in the municipal park to celebrate Ramadan.

15. The crescent moon is a significant religious symbol in Islam, often associated with the lunar calendar and important religious exercises such as Ramadan.

16. There were no banners or displays recognizing lent, which was in its fourth week, or Passover, which was less than a week away, on April 12, 2025.

17. Below are true and accurate images of the crescent moon display and the Ramadan banners that were posted on City property throughout the City.






18. The City's promotion and support of Ramadan constitute a governmental endorsement and promotion of the Islamic faith.

19. With Easter only two weeks away, on April 6, 2025, Plaintiff wrote the then-City Attorney, Jeremy Romer, an email with a subject line entitled, "[c]onfirmation of viewpoint neutrality," stating as follows:

> Dear Jeremy,
> As a resident of Dearborn, I was heartened to see the City willing to publicly recognize its citizens' celebration of religious holidays, as I believe the Supreme Court's establishment clause jurisprudence of the last several decades is misplaced and that the true standard should be whether the government is treating religions equally. I write, then, to confirm that Dearborn will be displaying a sign declaring Happy Easter with a cross and with a cross placed also in the park (and not the pagan bunny), as well as a Happy Passover with the Jewish star both on the

> signs and in the public park. I look forward to your reply as I much prefer to ensure equality of faith traditions, as opposed to a challenge to the display. Respectfully, Margot Cleveland

20. Neither Mr. Romer nor anyone else from the City responded to Plaintiff's email.

21. Plaintiff also submitted a Freedom of Information Act (FOIA) Request to the City pursuant to Michigan Compiled Laws §§ 15.231 *et seq*., seeking "all documents or writings, including, but not limited to, emails, text messages, correspondence, and/or other documents/writings" concerning, among other things, "[t]he decision to display the Ramadan Kareem banners on City property," "[t]he decision to display a crescent moon in celebration of Ramadan in a City park," "[t]he purchase of the banners and the crescent moon display," and any "third-parties involved in the decision(s) or sponsorship(s) of the displays."

22. On or about May 22, 2025, the City's FOIA office responded, providing records responsive to Plaintiff's request through a shared electronic folder.

23. Among other things, the documents responsive to the FOIA request revealed that the City spent public funds on the Ramadan banners and on the crescent-moon symbol displayed in the City's Peace Park, costing taxpayers approximately $1,500 and $5,000 respectively.

24. Other documents revealed that the City of Dearborn's Police Department sold Ramadan-themed shirts bearing the official department emblem.

True and correct images of the emblem, design, and shirt produced and sold by the City's police department appear below:









25. Additionally, Defendant Hammoud issued an Iftar invitation to select members of the community using his official City government email. Defendants spent public funds ($360) for signage and printing associated with this religious event.

26. Iftar is the meal eaten by Muslims to break their fast at sunset during the month of Ramadan. The word "Iftar" comes from the Arabic root f-t-r, which means "to break" or "to open." In Islamic terms, it refers specifically to breaking the fast after sunset prayer time begins.

27. Observing and engaging in Iftar is an Islamic religious exercise. Iftar symbolizes obedience to Allah's command. Muslims refrain from food, drink, and other physical needs from dawn until sunset, and Iftar is the moment when this fast ends for the day.

28. Defendant Hammoud would later make his anti-Christian bias clear during a September 9, 2025, City Council meeting. At that meeting, a Christian pastor, Ted Baram, spoke in opposition to the recent renaming of a local street in honor of Mr. Osama Siblani, a public supporter of organizations designated as terrorists by the U.S. Government.

29. Pastor Baram identified himself as a Christian and described having lived in Lebanon, Israel, and the West Bank before telling the City Council that the intersection signage was "quite inappropriate," comparing it to naming a street "Hezbollah Street or Hamas Street." He further stated that he wished "to encourage peace," quoting Christian scripture for the proposition that "the one who lives by the sword will die by the sword," and stating that Jesus, "called the prince of peace," said "blessed are the peacemakers."

30. Mr. Baram then highlighted several of Mr. Siblani's public comments, including Siblani's comment that the blood of "martyrs" "irrigates the land of Palestine," that fighters "should strike them with knives and with their bare hands," and that "[w]e are the Arabs who are going to lift Palestinians all the way to victory whether we are in Michigan [or] whether we are in Jenin . . . everyone should fight within his means. They will fight with stones. Others will fight with guns. Others will fight with planes, drones, and rockets. Others will fight with their voices, and others will fight with their hands and say, free, free Palestine."

31. Defendant Hammoud responded to Pastor Baram as follows: "[T]he best suggestion I have for you is to not drive on Warren Avenue or to close your eyes while you're doing it . . . . I think it's quite hypocritical [that] you're approaching this podium when you yourself have videos on YouTube standing in front of my mosque saying the cruelest of things about Muslims, about the religion of Islam, because you are a bigot and you are a racist and you are an Islamophobe. ***And although you live here, I want you to know as mayor, you are not welcome here***. And the day you move out of the city will be the day that I launch a parade celebrating the fact that you moved out of the city . . . because you are not somebody who believes in coexistence."

32. Pastor Baram's speech at the City Council meeting, on the public sidewalks outside of mosques, and as posted on YouTube is protected by the First Amendment.

33. Given the City's failure to respond to her outreach and the Mayor's disturbing outburst during the City Council meeting, Plaintiff, through counsel, wrote to Defendant Hammoud and the City Attorney, on September 25, 2025, objecting that "the City of Dearborn has become a hostile place for Christians and Jews," and noting that Dearborn's "singular celebration of Ramadan through the display of the banners discussed previously is one factor fueling this hostility."

34. The letter concluded: "To help heal those in your City who feel like outsiders due to the singular promotion of Islam, we would request that the City display at the appropriate time banners similar in size and content to the Ramadan banners that recognize the holy days of Christians and Jews, such as Christmas, Easter, Rosh Hashanah, and Yom Kippur, respectively. We are happy to work with you on the content and design of these banners. We look forward to a favorable reply."

35. The popular media outlet, *The Federalist*, where Plaintiff serves as the Senior Legal Correspondent, published an article that same day detailing Dearborn's discriminatory history and quoted from the letter.

36. Plaintiff amplified *The Federalist*'s coverage on her social media account at X, where she has more than 250,000 followers, tagging the Mayor in her post.



37. Neither Defendant Hammoud nor the City Attorney responded to the letter.

38. The Mayor's outburst during the City Council meeting, coupled with the renaming of a street after a terrorist-apologist, greatly concerned Plaintiff, and so in advance of the November 2025 election, she attempted to understand whether any candidates for City Council were sympathetic to terrorist organizations, and she wanted to know their position on the City's singular promotion of Islam.

39. On or about October 7, 2025, Plaintiff emailed one of the candidates for City Council, Devon O'Reilly, asking whether he "believed Hamas and Hezbollah are terrorist organizations," and whether "the City should celebrate Jewish and Christian holidays on par with Muslim holidays." She never received a response.

40. When Plaintiff went to vote at her local precinct on November 4, 2025, she planned to question any candidate present regarding his or her views on those same points.

41. Before voting that day, Plaintiff saw City Councilmember Kamal Alsawafy outside soliciting votes. Plaintiff asked him directly whether he considered Hamas and Hezbollah to be terrorist organizations.

42. Plaintiff reported the conversation and her reaction in *The Federalist*, where, as noted previously, she serves as the Senior Legal Correspondent:

But when I asked City Councilman Kamal Alsawafy his position, he refused to answer, responding instead: "You asking me that? I'm a captain in the Army National Guard. I think it's an unfair question. I'm a bronze star recipient."

"That's great. I love your service. So, what's the answer?" I responded.

Again, rather than answer, Alsawafy obfuscated, saying, "As far as me, 'cause I feel like it's a loyalty test. . . loyal to the United States. I've literally been wounded," and, "You're asking me if I believe in Hamas?"

After complimenting his "admirable" service, I said, "No. I'm asking if they are a terrorist organization."

The dance continued. Alsawafy: "What are they designated as?"

Me: "I'm asking your view."

Alsawafy: "The United States is very clear . . ."

At that point, I handed him back the campaign material he had offered me as I walked in to vote at my Dearborn polling location. Later that night, he won re-election.

I was—and am—disgusted. Our country narrowly escaped two mass terrorism attacks by teenagers and young adults. According to the criminal complaints, at least three Dearborn residents conspired with others to allegedly attack gay nightclubs in Ferndale, Michigan and patrons celebrating Halloween at the nearby Cedar Point, Ohio amusement park.

Just as our country needed (but failed to receive) a unified and forceful condemnation of political violence following the assassination of Charlie Kirk, my city needs its leaders to unequivocally condemn organizations that directly and intentionally target civilians—and not just ISIS, but Hamas and Hezbollah.

But instead, my city's leaders have attacked those raising concerns over local leaders' apparent embrace of Hezbollah and Hamas. We saw that most recently at a City Council meeting when a Dearborn resident

> objected to renaming a street after Osama Siblani based on Siblani's comments praising Hezbollah and Hamas as "freedom fighters" and celebrating Hassan Nasrallah, the former secretary-general of Hezbollah, as a hero.
>
> The resident, Christian pastor Ted Barham, explained: "I feel like having that sign up there is almost like naming a street Hezbollah Street or Hamas Street. Hezbollah bombed the embassy in Beirut, including many Americans. I just feel it's quite inappropriate."
>
> Dearborn's mayor, Abdullah Hammoud, responded by calling Barham an "Islamophobe," continuing: "Although you live here, I want you to know as mayor you are not welcome here. The day you move out of the city will be the day I launch a parade celebrating the fact that you moved out of the city."
>
> The mayor's outburst speaks volumes to the children and young adults of the city, as did the Islamic Institute of Knowledge's branding of Hezbollah member Fadel Abbas Bazzi as a "martyr" following his death when Israel targeted members of the terrorist organization with exploding cell phones.
>
> I had hoped that the arrest of the three Dearborn teens in the foiled terrorism plot would awaken our city leaders to the horrifying beliefs being instilled in our youth—that the intentional targeting of civilians is justifiable and their community will celebrate them as martyrs when they engage in terrorism.
>
> But Alsawafy's refusal to say that yes, he agrees that Hamas and Hezbollah are terrorist organizations leaves me hopeless. If a bronze star recipient lacks the courage to declare this simple truth, how can we expect ordinary moms and dads raising their children to speak out against such evil?

43. Plaintiff also amplified her article on her social media account, again tagging Defendant Hammoud.

44. Not only did the City ignore Plaintiff's requests for equal treatment for Christians and Jews, as the *Religion News Service* reported on February 24, 2026,

the City commissioned crescent-moon-and-star light displays on municipal street lights for Ramadan 2026, describing this as "the first of its kind in Dearborn." Defendant Hammoud was quoted, stating of the City-sponsored display, "This initiative reflects who we are as a city." In other words, rather than celebrate other religious traditions per Plaintiff's repeated requests, the City instead increased its promotion of Islam.

45. The City of Dearborn has never commissioned a comparable City-sponsored street light, banner, or park display program to mark Easter, Passover, Christmas, Rosh Hashanah, Yom Kippur, or any other Christian or Jewish observance.

46. The City's Ramadan crescent moon, street light, and banner programs and practices described above are displayed on City-owned property using City funds and coordinated by City officials, including Defendant Hammoud.

47. Defendants intend to continue their acts, customs, policies, practices, and procedures of promoting Ramadan and Islam and discriminating against Christians and Jews as set forth in this Complaint into the future.

48. On March 24, 2026, another Dearborn resident, Andrea Unger, addressed the City Council regarding disparate treatment of religious observances and City services first noting that "[t]he Dearborn Downtown Development Group has put up crescent moonlights down the city light poles on Michigan and Warren

for Ramadan," and then she asked whether "they will also be putting up crosses on the light poles to honor Good Friday and the Easter season."

49. Ms. Unger further told the City Council that when she went to the Dearborn police station to report her concerns regarding the volume of the Islamic call to prayer near her home, she found a stack of informational papers "completely written in Arabic," with no English-language version available. She asked what the papers were and was told that they contained a list of rights and phone numbers to call to report hate crimes. Ms. Unger asked an officer whether there were similar rights "for English speaking" residents and whether Jews or Christians were also protected from hate crimes, and she was told that hate crimes were "mostly directed at Muslims so they didn't need to" provide such information in English. Ms. Unger asked the City Council, "Why are city government notifications only given in a foreign language and not in English?" and stated that "there appears to be selective help given to some groups and not to others."

50. On March 30, 2026 and April 6, 2026, Plaintiff received emails signed by Defendant Hammoud, but sent by Hala Hamdan, addressed to: "Dearborn Community Members, Organizations, and Institutional Partners," and stating: "On behalf of the City of Dearborn, we request your presence at a Community Update discussion focused on recent city safety updates and our strategic response to

emerging challenges." The event was scheduled for April 7, 2026, at the library from 11 a.m. to 1 p.m., with an agenda stated as follows:

- Updates from the Mayor's Office on city-wide policies.
- Briefing from the Chief of Police regarding law enforcement protocols and community protections.
- Open floor for Q&A and community feedback.
- Discussion on collaborative steps to support vulnerable residents.

51. Plaintiff responded that she would attend the meeting, indicating her affiliation with *The Federalist*. When Plaintiff arrived the following day and before she entered the auditorium, the City's Chief of Police approached her and informed her that the meeting was not open to journalists but that she was free to attend as a resident as long as she did not report on the meeting. Plaintiff said she was attending because she was a resident but that she would not agree to not report details about the meeting if she believed they were newsworthy.

52. When the meeting began, Defendant Hammoud made a snide comment about residents of Dearborn whom he claimed were criticizing the City on social media in order to monetize their postings. Defendant Hammoud was referencing Plaintiff, as Plaintiff has regularly, over the last several years, criticized the Mayor for his anti-Israel comments, his voice as a terrorist apologist, as well as the City's refusal to treat Christians and Jews equally, tagging the Mayor on her posts.

53. For instance, on October 9, 2023, Plaintiff wrote: “Mayor @AHammoudMI Rape, murder, and taking children, the elderly and civilians (sic) hostages is not ‘tragic violence’ or ‘inevitable.’ Shame. On. You.” as a comment to the Mayor’s October 7, 2023, post: “Israel’s decades of illegal military occupation and imprisonment of Gaza make peace impossible and tragic violence inevitable.”



Margot Cleveland @ProfMJCleveland · Oct 9, 2023
Mayor @AHammoudMI Rape, murder, and taking children, the elderly and civilians hostages is not "tragic violence" or "inevitable." Shame. On. You.

Abdullah H. Hammoud @AHammoudMI · Oct 7, 2023
Israel’s decades of illegal military occupation and imprisonment of Gaza make peace impossible and tragic violence inevitable. Israel has trapped millions of Palestinians in Gaza in what is recognized by the international community as the world’s largest open-air prison. Failure

8 31 77 6.8K

54. Plaintiff was also critical of Defendant Hammoud’s comments at “ArabCon,” the annual convention of the American-Arab Anti-Discrimination Committee, where he reportedly “ripped into Israel for promoting what he called ‘apartheid’ and ‘genocide.’”



Margot Cleveland @ProfMJCleveland · Sep 14, 2024
So @AHammoudMI did you condemn Hamas? Hezbollah? October 7? What about Democrats' transgender policies? Porn in school policies? Are you endorsing West--only candidate who views Hamas & Hezbollah as you do--as freedom fighters & not terrorists.

freep.com
Dearborn mayor slams Israel for 'genocide' in addre...
Arab Americans from across the country are in Dearborn for a convention to talk about Gaza and ...

6 15 2.5K

Margot Cleveland @ProfMJCleveland · Sep 14, 2024
Hey @AHammoudMI you expose your anti-Semitism by using southern Lebanon as an excuse to bash Israel: Israel isn't "occupying" Lebanon-a terrorist organization, Hezbollah (you agree its terrorist, right?) is attacking Israel from Lebanon.

freep.com
Dearborn mayor slams Israel for 'genocide' in addre...
Arab Americans from across the country are in Dearborn for a convention to talk about Gaza and ...

1 7 18 2.4K

55. Later, on or about April 18, 2026, Plaintiff posted that the "Dearborn Mayor @AHammoudMI reposted @AbdulElSayed's post mocking @JohnFetterman. Makes me wonder if that's where @AbdulElSayed got the idea 'there are a lot of people in Dearborn who are sad' about the death of Khamenei."




56. After Defendant Hammoud's comment at the community meeting, the City's presentation continued, with City representatives explaining their policies of non-cooperation with ICE, prompting one resident to ask about using whistles to alert residents to the presence of immigration agents.

57. During the presentation, the Chief of Police suggested that Dearborn would not cooperate with ICE because the federal agency did not have judicial arrest warrants for their targets. In response, Plaintiff noted that ICE does *not* need an arrest warrant to detain illegal aliens.

58. The City presentation also spoke of outsiders coming into Dearborn and raising tension. The City was referring to Jake Lang.

59. During the comment period, Plaintiff suggested that the City schedule an event that would excite young people to attend and thus remove any oxygen from Lang and his ilk. Plaintiff, while a practicing Catholic who believes her religion is the one, true religion, also believes that Muslims and Jews should be treated respectfully and judged as individuals based on each individual's words and actions.

60. The meeting concluded. Since then, Plaintiff has not been invited to another community meeting.

61. About a week later, having still received no response from the City regarding its singular celebration of Islamic holy days, Plaintiff attended the City Council meeting on or about April 14, 2026, and during public comments, she told the City Council the following:

> On April 6th, 2025, I wrote the city attorney . . . . I was heartened to see the city willing to publicly recognize its citizens['] celebration of religious holidays and asked him to confirm that Dearborn would be treating Christians and Jews equally [by displaying] banners celebrating Easter and Passover in addition to the Ramadan banners. I never received a response. On September 25th, my attorney for the American Freedom Law Center wrote the mayor and the city attorney. In short, the letter highlighted the city's conduct over the last several years that represents an effort to establish a religion in violation of the First Amendment. In addition to the Ramadan [banners], the police and the fire department sold shirts that displayed a religious Ramadan message. The mayor used his government email to invite individuals to celebrate Iftar. Dearborn prohibited a Christian pastor from distributing religious literature and arrested other Christians [for] evangelizing . . .

> during an Arab festival. And then the mayor told the Christian [resident], 'Although you live here, I want you to know[,] as mayor, you're not welcome here.' My attorney never received a response. This year, instead of adding banners to celebrate Easter and Passover, the city instead added additional lighted displays to celebrate Ramadan. Any good lawyer will tell you that no one wins in litigation. The [C]ity [C]ouncil has the ability to fund both religious Easter and Passover banners and add a menorah to the holiday display. This is a great opportunity to bring all faith communities together and prove to outsiders that they do not know Dearborn and that Dearborn is one Dearborn where all religions are treated equally and celebrated. Will you do so?

62. On April 15, 2026, having received no reply from the City Council members the previous evening, Plaintiff sent an individualized email to each of the seven council members (Michael T. Sareini, Kamal Alsawafy, Mustapha Hammoud, Robert Abraham, Ken Paris, Gary Enos, and Devon O'Reilly), stating:

> Last night I asked if the City Council would fund banners to celebrate Easter and Passover. Although I hoped someone from the council would respond at the meeting, no one did. So, I write to ask you: Will you propose funding for Easter and Passover banners, as well as a menorah for the Peace Park? I would appreciate a response before the next City Council meeting and am happy to meet with you and other members of the council to discuss a positive way forward, as opposed to litigation. Also, for your convenience, I am attaching a copy of the original email I sent the City Attorney who did not respond, as well as the letter sent by my attorneys to the City Attorney and Mayor. Thank you for your attention to this matter. Regards, Margot Cleveland.

63. Plaintiff attached to each email a copy of her April 6, 2025, email to City Attorney Jeremey Romer and a copy of the American Freedom Law Center's September 25, 2025 letter to Defendant Hammoud.

64. Plaintiff also attempted to find a secondary email for the City Council members to ensure they received the message. She found one possible email for one member and found a second member on LinkedIn, and sent him a message there.

65. Specifically, Plaintiff sent Councilmember Robert Abraham a message through LinkedIn, noting: "I emailed you about the Dearborn banners but have not received a response. Could we chat by phone?"

66. At 6:12 p.m. that same day, Defendant Abraham replied: "We will need to arrange to have legal counsel present, since you stated you are represented and preparing legal action against the City/me. I can try to get a date or two from our Legal Department."

67. Plaintiff replied, on or about April 23, 2026, as follows: "My goal is to NOT sue but to have the City treat Christians and Jews the same by funding the banners for Easter and Passover. And as the City attorney will tell you[,] you can meet with a person [who is] represented—it's just the attorney who can't. So[,] I would prefer to meet with you/talk one on one . . . . However, I am happy to meet with you and anyone else on the [C]ouncil with the city attorney present, to see if we can resolve the issue[,] [something] the City could have done a year ago if they just responded to my email."

68. On or about April 24, 2026, Mr. Abraham replied: "We have specifically been advised not to meet with your group[,] as you had threatened

litigation already[,] and stated on the record that you were represented by legal counsel. You may call our legal department and get a direct response to scheduling meetings with Council members and what we have been advised by our [C]orporation [C]ounsel."

69. Plaintiff responded the same day: "I don't have a group! It's just me, a concerned resident who was ignored when I asked for the City to treat Christians and Jews equally."

70. Defendant Abraham replied: "I understand[,] but the threat of litigation and legal action goes far beyond a concern."

71. On April 27, 2026, Plaintiff sent an email to the individuals identified in the meeting record as the City's then-attorneys, Ola Faraj and Deborah Ivery, and to each member of the City Council, stating in relevant part:

> Following the April Dearborn City Council meeting, I reached out to each council member asking if they would support funding for Easter and Passover banners, requesting they respond before the next meeting. I was informed that your office directed the council members not to respond to me because of the threat of litigation. However, as I made clear during my public comments, my goal is to avoid litigation[,] and I would like to discuss with the council members funding such banners, along with funding a [m]enorah for the Peace Park to accompany the Christmas display. I was told I should contact you to set up a meeting, and I do so now. And as a gesture of good will[,] and to confirm my intent to avoid litigation, it would just be a meeting with me, as a citizen, and not my legal counsel. (He is [copied] above to confirm you may speak with me directly.) I look forward to working with any City Council members open to a positive and constructive conversation about my concerns.

72. On April 28, 2026, Plaintiff's counsel separately confirmed by email to the same recipients: "This confirms that there are no objections to Ms. Cleveland speaking with any of you directly regarding the matter addressed in her email below. Please contact me if you have any questions."

73. Neither Plaintiff nor her counsel received a response from the City Attorney or any of the City Council members.

74. Accordingly, on or about April 27, 2026, Plaintiff reached out to Mr. Abraham, stating: "Thanks again for sharing your concerns. I have just emailed the City attorneys and all Council Members with a request to meet to reach a positive resolution. I hope I can count on you to convey your desire to meet with me. (And I can assure you if litigation was my goal I would have filed suit the second the Mayor installed MORE Ramadan displays while intentionally ignoring my request to display Easter and Passover banners.)"

75. On or about May 6, 2026, Plaintiff had still heard nothing and sent a follow-up message, asking Mr. Abraham if he would "ask the City Attorney to arrange a meeting with us so you can hear my concerns."

76. On May 7, 2026, Mr. Abraham responded, asking for Plaintiff's contact information, which she provided, including her address, home and cell phone numbers, and her email address.

77. On May 15, 2026, Plaintiff replied: "FYI: The City Attorney has ignored my outreaches. Another thought: If you have a personal attorney who is willing to chat with me for 5 minutes on your behalf in your individual capacity, that might be a way forward. Feel free to share my above contact information with him/her and let me know whether you are open to that and his/her name."

78. On May 17, 2026, Mr. Abraham replied, "I would recommend you make your comments at the public input portion of the council meeting on [T]uesday."

79. Plaintiff responded: "That was actually my plan, but I also wanted to give you the opportunity to hear my thoughts so you're not caught off guard given that you were at least respectful enough to respond to me," and after he said Plaintiff could share her thoughts via email, Plaintiff replied: "I appreciate that Rob, but my concern is that you are receiving independent legal counsel who can provide you guidance on my thoughts re my request to the City [Attorney], which is why I suggested speaking with your attorney who would hold a duty to you (and not the City)."

80. Mr. Abraham responded: "Our Corporation Counsel represent the city council member in our capacity," to which Plaintiff concluded: "Hey Robert, Thanks for the note. And yes I know, which is why I was very particular in my phrasing above . . . give it a careful re-read (I don't mean this at all as snarky. . . .). In any

event, I will be their (sic) on Tuesday if there isn't another lawyer you feel comfortable with me speaking with before then."

81. Mr. Abraham concluded: "I must follow our legal counsel's recommendations. He represents me in my official capacity. Maybe if you retract the comments of threatening legal action, we can open up discussions," to which Plaintiff ended "Understand. Thanks."

82. City Charter Section 10.2 provides that "[t]he Mayor shall be the Chief Executive Officer of the City," and it vests the Mayor with, among other powers, the "[e]nforcement of all laws and ordinances"; the "[a]ppointment and removal of appointive officers and members of multi-member bodies," subject to the requirement that "[t]he appointment of the person as Corporation Counsel shall be subject to the confirmation of the Council"; "[p]reparation and administration of the annual budget of the City"; and "[e]nsuring the efficient administration of all departments and functions of the city government not under the jurisdiction of any other elected official." Accordingly, the Mayor has the power to fire the Corporation Counsel without the City Council's approval.

83. Plaintiff then went to address the City Council on May 19, 2026. When she arrived, the Council was meeting to discuss the budget. The discussion and exhibits revealed that the City had a surplus. At the end of that meeting, when public comments were opened, Plaintiff briefly asked the City Council to appropriate a

small amount of the surplus to fund banners to celebrate Easter and Passover and a Menorah for the Peace Park, similar to how the City currently and in the past celebrated Ramadan with banners and a religious display in the park.

84. After the budget meeting ended, the regular City Council meeting for May 19, 2026, began. Plaintiff immediately completed a form indicating she wanted to speak during the City Council meeting. The City Council president planned not to allow Plaintiff to comment. Plaintiff approached the clerk, and the clerk then noted that Plaintiff had a right to comment at the City Council meeting because her earlier comments were for the budget meeting. After this clarification, the City Council president called on Plaintiff.

85. Plaintiff then stated during the public comment period the following:

> Last month I had shared with the City Council the fact that the Mayor and the City Attorney had ignored my request to end the viewpoint discrimination against Christians and Jews in its placement of religious banners that solely celebrated Ramadan[,] in violation of the Establishment Clause. I came to the City Council because you . . . are a separate municipal entity. You have your own power and authority[,] and you have the authority to allocate money to fund banners that celebrate Easter and Passover. After that meeting, I emailed every one of you asking to talk to you. I was informed the City [Attorney] didn't want [you] talking with me and that I should set up a meeting. I tried[,] and two emails were ignored. I even offered to meet without my lawyer to show that I'm trying to act in good faith to come up with [a] resolution. But again, it was ignored, which is troubling. But what would be even more troubling is if the City Attorney did not advise you of a conflict of interest in representing both the Mayor and the City Council[,] and you individually. The Mayor has already rejected the efforts to put up banners to celebrate Passover and Easter[,] and in fact[,] afterwards[,] put up additional Ramadan banners[,] as if to say it

> doesn't matter what you want. Let me be clear[:] I came to the City Council because the Mayor and his administration ignored my requests. Again, you are a separate municipal entity[,] and each of you [is] liable for what you do, not what the Mayor does. My request is very simple. You have a budget surplus . . . . Pass a resolution that directs the funding and placement of banners to celebrate Easter and Passover and have a Menorah added to the holiday display. [T]he City Attorney might tell you you can't talk to me, but he can't tell you that you can't propose a resolution. And I would hope that an independent attorney who is representing your best interest[s] would not give the advice to . . . ignore [a resident] when [she] is trying to work with you to avoid litigation.

86. After being told she had "30 seconds" remaining, Plaintiff concluded: "So again, you have the power to pass a resolution. Do any of you have [any] interest in actually showing that Christians and Jews are going to be treated equally by putting a banner up? Or is this your policy?"

87. No one responded to Plaintiff, even though the meeting had included numerous exchanges between councilmembers and residents, including one where the City Council allowed the resident to continue to speak and engage with the Council after her three minutes expired.

88. When no one engaged with Plaintiff, she noted the disparity, stating, "You had no problem talking to everybody else who came up here." The presiding officer then stated that Plaintiff's time had expired.

89. Specifically, at that same May 19, 2026 City Council meeting, a member of the public affiliated with a labor union local identified as "Local 600" addressed the Council in support of a proposed public-transit millage. A Council

member responded on the record: "[W]e fully support and endorse this mill[age]. We hope that public transit will . . . finally become a reality for one of the major metropolitan areas in the country without a major public transit system. [We're] excited to see this thing come through[,] and we'll be championing it all the way through."

90. Also during that same May 19, 2026 meeting, another resident raised concerns about restricted access hours at gates to a City park playground and asked the Council to consider opening the gates for a longer daily period. Mr. Sareini, presiding as Council president, responded at length. He explained that the gate schedule was "an administrative action done by the Mayor," but nonetheless substantively addressed the resident's underlying concerns. He described years of neighborhood complaints about "the amount of traffic . . . at the top of the park" and children "running across the streets," creating what he called "a public safety issue." He further described the City's enforcement efforts against unauthorized parking and vehicle sales at the park ("people were parking cars there . . . for sale, that's not allowed[;] [t]railers, that's not allowed either"), and stated that he personally agreed with aspects of the resident's request regarding morning access hours. Defendant Hammoud also responded directly on the same topic, stating that "Cherry Hill car traffic is probably the number one complaint I hear about for that neighborhood . . . the speeding, the reckless driving."

91. During this exchange, the City Council president also made clear what the City Council's authority was, namely the "approval for appropriation," while "the administrative aspect is [for] the Mayor."

92. The City Council thus knew full well that it had the authority to appropriate money for Christian and Jewish displays.

93. City Charter Section 7.1 provides that "[t]he Council shall have full power and authority to exercise all the legislative powers conferred upon the City by law." City Charter Section 7.14 provides that "[t]he Council shall provide for an annual appropriation of money for municipal purposes." City Charter Section 7.8 provides that "[n]o ordinance or resolution shall be adopted except by the affirmative vote of at least four members of the Council."

94. The City Council's own understanding of this division of authority under the City Charter was confirmed on the record at the May 19, 2026 meeting. During a discussion of the City budget, Mr. Sareini, as Council president, asked a City finance official to "explain to the councilman the role of the council regarding budgetary[]" authority; "if we have the ability to administrate[,] because the charter is crystal clear on that aspect." The official responded: "Correct. The council's role is budgetary in this aspect[;] it's not . . . to actually conduct the administrative role of removing staff." Later in the same meeting, addressing a proposal by Councilmember Ken Paris, Mr. Sareini stated that the disputed action was "not the

council role," and that a Council member's "role was to fund the positions," but that Council members do "not have the . . . ability to execute them." Earlier in the same meeting and when discussing the park gate schedule described above, Mr. Sareini likewise distinguished between the Council's "appropriation" authority—"we are the appropriation arm[,] and we did appropriate the money for the fence"—and "the administrative aspect," which he stated "is the [M]ayor."

95. The City Charter's grant to the City Council of "full power and authority to exercise all the legislative powers conferred upon the City" (Section 7.1) and of the power of "annual appropriation of money for municipal purposes" (Section 7.14), together with the Council's own on-the-record recognition that "the charter is crystal clear" in vesting the Council with budgetary and appropriation authority independent of the Mayor's administrative authority, demonstrate that the City Council had the legal authority, without any action by Defendant Hammoud, to adopt a resolution funding and directing the placement of Easter and Passover banners and a Menorah, as Plaintiff repeatedly requested. The City Charter's separate grant of authority to the City Council to "retain an attorney of its own selection other than and in addition to the Corporation Counsel" (Section 10.19) further shows that the City Attorney's representation of both the Mayor and the City Council did not prevent the Council members from seeking independent legal advice regarding Plaintiff's request, as Plaintiff specifically suggested to them.

96. On or about May 20, 2026, the City Council passed the annual budget without allocating any funds for Easter or Passover banners or displays. No one from the City contacted Plaintiff before or after the vote regarding her request.

97. In fact, the City's refusal to allocate any of the surplus funds to provide equal treatment to Christians and Jews followed Defendant Hammoud's decision to authorize the installation of *additional* and lighted Ramadan-related signage in the City for 2026, which further widened the disparity in treatment between Ramadan and Christian and Jewish observances that Plaintiff had specifically asked the City to correct.

98. On June 15, 2026, Plaintiff's counsel sent a litigation-hold and evidence-preservation letter to a City official, stating that Plaintiff "has retained the American Freedom Law Center to represent her and to pursue possible legal claims regarding the City of Dearborn's open promotion of Islam and hostility toward Christians and Jews," and that the firm was "reviewing the matter for possible violations arising under the United States Constitution and 42 U.S.C. § 1983." The letter requested preservation of documents, emails, text messages, and other records concerning, among other things, religious displays on City property during Ramadan, invoices and funding sources for those displays, the use of Police and Fire Department emblems in connection with religious displays, religious celebrations organized or promoted by the Mayor or his administration, and "a verbal altercation

at a City Council meeting in which the Mayor stated to a [resident]: 'Although you live here, I want you to know as mayor, you are not welcome here.'" The letter further requested preservation of all materials referencing Plaintiff or her counsel's representation of her, stating that Plaintiff "is concerned that the Mayor and potentially some members of the City Council may have retaliated against her for exercising her First Amendment rights."

99. On August 14, 2026, after a public figure identified in the record as Jake Lang announced a planned visit to the City of Dearborn, Plaintiff wrote to the City's Chief of Police: "I was horrified to see this news[.] Might I as[k] if the Police Department would be supportive of an independently organized 'Love thy Neighbor' event at the Peace Park to start at 7 that day[?] And whether there is any funding that might be available to provide 'tickets' to the food carts to those who attend?" Plaintiff did not receive a response, even though she had prior (and mutually respectful) conversations with the Chief of Police, and he had previously responded to an earlier email Plaintiff had sent him. These exchanges were before Plaintiff spoke at the City Council meeting on April 14, 2026. This failure to engage with Plaintiff is yet another example of the City treating her as a *persona non grata* due to her repeated requests that the City stop discriminating against Christians and Jews.

100. The events detailed above follow a documented history of the City treating Muslim more favorably than non-Muslims, as demonstrated by multiple

incidents at the Arab International Festival. *See Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011); *Acts 17 Apologetics v. City of Dearborn*, No. 11-cv-10700, 2012 U.S. Dist. LEXIS 197041 (E.D. Mich. Feb. 7, 2012); *Bible Believers v. Wayne Cty.*, 805 F.3d 228 (6th Cir. 2015).

101. The hostile environment toward non-Muslims, particularly Jews, in the City of Dearborn was also on public display during an International Al-Quds Day rally held in the City on the last day of Ramadan in 2024, where the crowd was shouting, "Death to America" and "Death to Israel." *See* https://www.foxnews.com/us/death-america-death-israel-chants-pour-muslim-protesters-michigan-last-day-ramadan (last visited Sep. 14, 2026).

102. While the Mayor claimed on social media to "reject all inflammatory and violent statements made at the 2024 gathering," he did not expressly condemn the vitriol directed toward Jews, and he certainly did not publicly tell the protest organizers and participants that they "***are not welcome here***. And the day [they] move out of the city will be the day that [he] launch[es] a parade celebrating the fact that [they] moved out of the city . . . because [these protestors] are not somebody who believes in coexistence."

103. Similarly, the Mayor did not tell Osama Siblani that he was "not welcome" in the City. To the contrary, even after Pastor Baram quoted some of Siblani's inflammatory and violent statements, the Mayor reiterated that Siblani's

name was to remain on the street, with the Mayor adding that he "spoke at a ceremony celebrating" the renaming of the street in Siblani's honor.

104. The Mayor does not believe in coexistence as evidenced by his actions, including those related Plaintiff, as set forth in this Complaint.

105. Most recently, the Mayor publicly extended an invitation to Macklemore, a rapper who is known for anti-Semitic rhetoric and imagery, to perform a free concert in the City of Dearborn that would be sponsored by the City. This invitation came on the heels of other venues refusing to allow Macklemore to perform due to his anti-Semitism.

**FIRST CLAIM FOR RELIEF**

**(First Amendment Freedom of Speech and Retaliation)**

106. Plaintiff incorporates by reference all stated paragraphs.

107. By reason of the aforementioned acts, customs, policies, practices, and/or procedures adopted and enforced under color of state law, Defendants have deprived Plaintiff of her right to freedom of speech in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

108. Plaintiff engaged in multiple activities protected by the First Amendment, including her reporting at *The Federalist* and her work as a journalist; her public comments on X criticizing Defendant Hammoud for excusing and

justifying terrorism and for discriminating against Christians and Jews; her public comments on X criticizing Councilmember Kamal Alsawafy for refusing to condemn Hamas and Hezbollah; her April 6, 2025 email to the City Attorney; her April 7, 2026 comments at the Community Update; her April 14, 2026 public comments at the City Council meeting; her April 15, 2026 emails to each Council member; and her petitioning of the City government for equal treatment.

109. Defendant Hammoud, acting under color of state law, took adverse action against Plaintiff because of that protected activity, including the following: authorizing the additional installation of lighted Ramadan signs as a direct affront to Plaintiff's request for Christian and Jewish displays; directing the City Attorney to not communicate with Plaintiff; directing the Chief of Police to not communicate with Plaintiff; directing City Council members not to communicate with Plaintiff, even though they are her representatives in the government; opposing funding for Christian and Jewish religious displays; and excluding Plaintiff from additional Community Meetings.

110. Defendant Hammoud, as the Mayor of the City of Dearborn, is a final policy maker for the City, and his actions as set forth in this Complaint constitute the customs, policies, practices, and/or procedures of the City of Dearborn.

111. Defendant Hammoud's actions as set forth in this Complaint were retaliatory and intended to discourage Plaintiff from speaking and thus exercising

her rights to free speech, including her right to petition her government for the redress of grievances, protected by the First Amendment.

112. Defendant Hammoud's actions would chill a person of ordinary firmness from continuing to engage in the protected speech, press, and petitioning activity in which Plaintiff engages.

113. Plaintiff's protected speech activity, her condemnation of terrorism, her support for the Jewish people, and her requests for equal treatment of Christians and Jews were each a motivating factor in Defendant Hammoud's adverse and retaliatory actions, and these adverse actions would deter a person of ordinary firmness from continuing to engage in that protected activity.

114. As a direct and proximate result of Defendants' retaliatory actions, Plaintiff has suffered a deprivation of her First Amendment rights.

115. Plaintiff's political and religious viewpoints motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent or motive to silence Plaintiff's political and religious viewpoints.

116. Plaintiff's right to be free of retaliation for engaging in activity protected by the First Amendment was clearly established.

117. The law is clearly established that an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.

118. As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, entitling her to declaratory and injunctive relief and nominal damages.

**SECOND CLAIM FOR RELIEF**

**(Fourteenth Amendment Equal Protection)**

119. Plaintiff incorporates by reference all stated paragraphs.

120. By reason of the aforementioned acts, customs, policies, practices, and/or procedures, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiff of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

121. By retaliating against Plaintiff for engaging in activity protected by the First Amendment based the content and viewpoint of her speech, which Defendants disfavor, Defendants have deprived Plaintiff of the equal protection of the law.

122. As set forth in this Complaint, Defendants treated Plaintiff disparately as compared to similarly situated persons and such disparate treatment burdened Plaintiff's fundamental right to freedom of speech in violation of the Fourteenth Amendment.

123. Plaintiff received disparate treatment from Defendants based on Plaintiff's religion, religious beliefs, and political and religious viewpoints in violation of the Fourteenth Amendment.

124. As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, entitling her to declaratory and injunctive relief and nominal damages.

## THIRD CLAIM FOR RELIEF

### (First Amendment Establishment Clause)

125. Plaintiff incorporates by reference all stated paragraphs.

126. By reason of the aforementioned acts, customs, policies, practices, and/or procedures, created, adopted, and enforced under color of state law, Defendants have violated the Establishment Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

127. Defendant City of Dearborn, through Defendant Hammoud and other City officials, sponsored, funded, and promoted religious displays, banners, symbols, and religious events for the Islamic faith, including Ramadan, on City property and through City resources, while providing no comparable sponsorship,

funding, or promotion for Christian or Jewish observances, including Easter and Passover, despite Plaintiff's repeated requests to do so.

128. The clearest command of the Establishment Clause is that the government may not officially prefer one religion, religious denomination, or faith tradition over another.

129. By selectively permitting and promoting religious expression for Muslims but denying similar expression for Christians and Jews, as set forth in this Complaint, Defendants have conveyed and effected governmental preference for one faith tradition over another.

130. Defendants have used governmental authority and resources to favor and promote the expression of one religion (Islam) over other religions.

131. Defendants' preferential treatment of one religion (Islam) and hostility toward other religions (Christianity and Judaism) is inconsistent with the Establishment Clause and our nation's history and tradition of denominational neutrality.

132. This pattern of unequal City sponsorship of religious observance, viewed in light of the totality of the circumstances including Defendant Hammoud's own public statements describing the Ramadan program as reflecting "who we are as a city," reflects an impermissible governmental preference for one religion over others in violation of the Establishment Clause.

133. It is clearly established that the government cannot establish a religion by providing preference for one faith while discriminating against others.

134. Defendants' pro-Islam actions as set forth in this Complaint convey an impermissible, government-sponsored message of disapproval of and hostility toward Christians and Jews and their religious beliefs and practices. As a result, Defendants' pro-Islam actions send a clear message to Plaintiff and others who are not adherents to the Islamic faith that they are outsiders, not full members of the political community and an accompanying message that those who adhere to Islamic religious beliefs and practices are insiders, favored members of the political community, in violation of the Establishment Clause.

135. As a direct and proximate result of Defendants' violation of the Establishment Clause, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, entitling her to declaratory and injunctive relief and nominal damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A) to declare that Defendants violated Plaintiff's fundamental constitutional rights as set forth in this Complaint;

B) to enjoin Defendants' acts, customs, policies, practices, and/or procedures that favor Muslims and discriminate against Christians and Jews as set forth in this Complaint;

C) to award Plaintiff nominal damages against all Defendants;

D) to award Plaintiff her reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

E) to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (Ariz. Bar No. 009616; DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
6218 Georgia Avenue NW, Suite 1 No. 403
Washington, DC 20006
Tel: (646) 262-0500; Fax: (801) 760-3901
dyerushalmi@americanfreedomlawcenter.org