**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**MARGOT CLEVELAND,**

Plaintiff,

v.

**CITY OF DEARBORN, MICHIGAN; ABDULLAH H. HAMMOUD,** individually and in his official capacity as Mayor of the City of Dearborn, Michigan,

Defendants.

No. 2:26-cv-13519-LVP-CI

Hon. Linda V. Parker

Magistrate Judge Curtis Ivy, Jr.

# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Margot Cleveland ("Plaintiff"), by and through undersigned counsel, hereby moves this Court for a preliminary injunction enjoining Defendants City of Dearborn, Michigan ("City" or "Dearborn") and Abdullah H. Hammoud, Mayor of the City of Dearborn ("Mayor" or "Defendant Hammoud") (collectively, "Defendants"), and their officers, agents, servants, employees, and all persons acting in concert with them, from (1) erecting, displaying, or maintaining on City property—including City light poles and street lights, City banners, and the City's Peace Park—Islamic religious symbols or displays, including "Ramadan Kareem" banners, crescent moon displays, crescent moon and star street light displays, and lighting City buildings to

celebrate Ramadan; (2) expending public funds or other City resources to celebrate or promote Islam or Ramadan, including City-funded Iftar events and associated signage and printing and the selling of Ramadan-themed shirts and other items by City departments; and (3) purchasing, commissioning, or otherwise acquiring additional Islamic symbols or displays.

"[T]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). For at least two consecutive years, Defendants have used City property and taxpayer money to celebrate one faith—Islam—and one faith alone. In 2025, the City paid hundreds of dollars for "Ramadan Kareem" banners hung on public property throughout the City and more than $6,000 for a large, lighted Islamic crescent moon erected in the City's Peace Park, and City officials then expended additional funds for lighted Islamic crescent moon and star displays placed on city light poles; the Mayor used his official City email to invite select residents to an Iftar, the religious meal that breaks the daily Ramadan fast, paying for associated signage and printing with public funds, and the City Police Department sold Ramadan-themed shirts. There were no banners, displays, or other materials recognizing Lent, Easter, Passover or the Christian or Jewish faiths.

Plaintiff, a practicing Catholic and Dearborn resident since 2007, asked, beginning in April 2025, that the City treat Christians and Jews equally by

recognizing Easter and Passover in the same manner. City officials ignored her. Then, for Ramadan 2026, the City and Mayor *expanded* their promotion of Ramadan, commissioning crescent moon and star light displays on municipal street lights—"the first of its kind in Dearborn"—with the Mayor proclaiming, "This initiative reflects who we are as a city." Weeks later, the City adopted a budget with a surplus but without a single dollar for any Christian or Jewish observance. Defendants intend to continue their promotion of Islam and Ramadan into the future.

Defendants' promotion of Islam and Ramadan also violates the Equal Protection Clause of the Fourteenth Amendment. The City extends to one faith—and denies to all others—official recognition of its holy days, the use of City property and City personnel to celebrate them, and taxpayer funds to pay for those celebrations. When Plaintiff, a similarly situated resident and taxpayer, repeatedly asked that her own faith's holy days receive the same treatment, the City refused. A government classification based on religion is "inherently suspect," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam), and the City cannot justify its discrimination under strict scrutiny.[1]

---

[1] This motion seeks preliminary relief on Plaintiff's Establishment Clause and Equal Protection claims insofar as it alleges disparate treatment based on Plaintiff's religion. (Compl. ¶¶ 119-35, ECF No. 1, PageID.38-41). Plaintiff does not, by this motion, seek preliminary relief on her First Amendment retaliation claim (*id.* ¶¶ 106-18, PageID.35-38), and she expressly reserves that claim.

Ramadan 2027 is expected to begin on or about February 8, 2027. Absent an order from this Court, Defendants will again purchase, erect, and/or display religious symbols on City property and spend public funds to celebrate Islam and Ramadan, thereby officially preferring Islam over all other faiths and sending Plaintiff and other non-Muslim residents the message that they are "outsiders, not full members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000) (cleaned up). Plaintiff brings this motion now, well in advance of Ramadan 2027 and before the City procures or installs its displays, so that the Court may resolve it on an orderly schedule. The requested injunction is necessary to prevent irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.").

Pursuant to E.D. Mich. LR 7.1(a), on November 23, 2026, Plaintiff's counsel, Robert J. Muise, and Defendants' counsel, J. Carter Fisher, conducted a telephone

conference in which Plaintiff's counsel explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought.

For the reasons set forth in the accompanying brief, Plaintiff has demonstrated that she is likely to succeed on the merits of her constitutional claims, that she will suffer irreparable harm absent the requested injunction, that granting the injunction will not cause substantial harm to others, and that granting the injunction is in the public interest.

Accordingly, Plaintiff respectfully requests that the Court grant this motion and issue the requested preliminary injunction.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
Kate Oliveri, Esq. (P79932)
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq.
6218 Georgia Avenue NW, Suite 1 No. 403
Washington, DC 20006
Tel: (646) 262-0500; Fax: (801) 760-3901
dyerushalmi@americanfreedomlawcenter.org

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**MARGOT CLEVELAND,**

Plaintiff,

v.

**CITY OF DEARBORN, MICHIGAN; ABDULLAH H. HAMMOUD,** individually and in his official capacity as Mayor of the City of Dearborn, Michigan,

Defendants.

No. 2:26-cv-13519-LVP-CI

Hon. Linda V. Parker

Magistrate Judge Curtis Ivy, Jr.

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## ISSUE PRESENTED

Whether Defendants' practice of using City property, City personnel, and taxpayer funds to celebrate Islam and its religious observances, including Ramadan—through "Ramadan Kareem" banners, a lighted crescent moon display in the City's Peace Park, crescent moon and star street light displays, a Mayor-hosted Iftar, the selling of Ramadan-themed apparel by City departments, and the lighting of a public building (or buildings)—while refusing repeated requests to recognize Christian and Jewish holy days, officially prefers one religion over others in violation of the Establishment Clause of the First Amendment and discriminates on the basis of religion in violation of the Equal Protection Clause of the Fourteenth Amendment, thereby causing irreparable harm and warranting the requested preliminary injunction.

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019)

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001)

*Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025)

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976)

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)

*Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989)

*Elrod v. Burns*, 427 U.S. 347 (1976)

*Epperson v. Ark.*, 393 U.S. 97 (1968)

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947)

*Fowler v. R.I.*, 345 U.S. 67 (1953)

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)

*Heckler v. Mathews*, 465 U.S. 728 (1984)

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)

*Larson v. Valente*, 456 U.S. 228 (1982)

*Lynch v. Donnelly*, 465 U.S. 668 (1984)

*Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019)

*Niemotko v. Md.*, 340 U.S. 268 (1951)

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)

*Town of Greece v. Galloway*, 572 U.S. 565 (2014)

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)

U.S. Const. amend. I

U.S. Const. amend. XIV

Fed. R. Civ. P. 65

## INTRODUCTION

"Whatever else the Establishment Clause may mean . . . , it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed." *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 605 (1989). Just last year, a unanimous Supreme Court reaffirmed that "[t]he clearest command of the Establishment Clause" is that the government may not "officially prefe[r]" one religion over another, and that the government must "maintain 'neutrality between religion and religion.'" *Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247, 254 (2025) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982) & *Epperson v. Ark.*, 393 U.S. 97, 104 (1968)).

The City of Dearborn has disregarded that command. Using City property and taxpayer money, the City has celebrated Islam and the Islamic holy month of Ramadan with "Ramadan Kareem" banners, a lighted crescent moon—an Islamic religious symbol—in the City's Peace Park, and, beginning in 2026, crescent moon and star light displays on municipal street lights. The Mayor, using his official City email and City funds, has hosted an Iftar, the religious meal breaking the Ramadan fast. Similarly, the City's police department has lighted its building green to celebrate Ramadan and sold Ramadan-themed apparel. Meanwhile, the City has refused to provide similar recognition to Easter, Passover, Rosh Hashanah, Yom Kippur, or the Christian and Jewish faiths and religious observances.

Plaintiff Margot Cleveland—a practicing Catholic, a Dearborn resident since 2007, and a City taxpayer—spent more than a year asking the City, politely and repeatedly, to treat Christians and Jews equally. She wrote the City Attorney. Her counsel wrote the Mayor and the City Attorney. Plaintiff addressed the City Council on multiple occasions and emailed every Council member. She offered to meet without her lawyer. The City ignored her, and the Mayor responded by *expanding* the City's Ramadan displays, declaring that the City-sponsored program "reflects who we are as a city." That is precisely the official denominational preference the Establishment Clause forbids. Indeed, the Supreme Court has never upheld a government display honoring a single faith's religious holy day (or month) standing alone. And the history and tradition that sustained the century-old memorial in *American Legion v. American Humanist Ass'n*, 588 U.S. 29 (2019), are entirely absent from a program of newly purchased religious symbols, first displayed in 2025 and expanded in 2026, and which hold no secular meaning. Because Defendants intend to continue their promotion of Islam and Ramadan, and Ramadan 2027 is fast approaching, Plaintiff respectfully requests that the Court preliminarily enjoin Defendants from using City property and public funds to celebrate Islam and Ramadan pending a final decision in this case.

The City's conduct also violates the Equal Protection Clause. The City has classified its residents by religion, extending official recognition, City property, and

public funds to celebrate the holy days (month) of one faith while refusing Plaintiff's repeated requests that her own faith's holy days—and those of her Jewish neighbors—receive the same treatment. Religious classifications are "inherently suspect," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam), and the City's discrimination cannot survive strict scrutiny. Where, as here, the government confers a benefit on one group and denies it to another, the Constitution requires equal treatment, which "can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (citation omitted). Having refused for more than a year to extend equal treatment, the City should be enjoined from continuing its preference while this case proceeds.

## STATEMENT OF FACTS

### A. The Parties.

Plaintiff Margot Cleveland is an adult citizen of the United States who has resided in the City of Dearborn since 2007. She is a practicing Catholic, an award-winning journalist, the Senior Legal Correspondent for *The Federalist*, and a City taxpayer who objects to her taxes being used to promote Islam over other faiths. (Cleveland Decl. ¶¶ 2-3, 5-6 at Ex. 1). Defendant City of Dearborn is a Michigan municipal corporation responsible for the customs, policies, and practices of its Mayor's Office, Law Department, and City Council. (*Id.* ¶ 7). Defendant Hammoud

is the Mayor and Chief Executive Officer of the City, responsible for its executive actions, customs, policies, and practices, and he is a final policymaker for the City. (*Id.* ¶ 8).

**B. The City's Ramadan Displays and Celebrations.**

In or about April 2025, while in downtown Dearborn, Plaintiff discovered that the City had placed numerous banners on public property proclaiming "Ramadan Kareem" ("Generous Ramadan"), and that the City had erected a large, lighted crescent moon in the municipal park to celebrate Ramadan. (Cleveland Decl. ¶¶ 9-10 at Ex. 1). Ramadan is the ninth month of the Islamic calendar, observed by Muslims as a holy month of fasting and prayer that commemorates the revelation of the Qur'an to the Prophet Muhammad; participation in Ramadan is an Islamic religious exercise. (Jasser Decl. ¶¶ 11-12, 15 at Ex. 2). The crescent moon is a significant religious symbol in Islam, associated with the lunar calendar and religious observances such as Ramadan. (*Id.* ¶¶ 23-24). At the time, Lent was in its fourth week and Passover was less than a week away, yet the City displayed no banners or displays recognizing either. (Cleveland Decl. ¶ 26 at Ex. 1).

Records the City produced in response to Plaintiff's FOIA requests confirm that the City spent public funds on the Ramadan banners (hundreds of dollars) and on the crescent-moon display in the City's Peace Park (more than $6,000). (Cleveland Decl. ¶¶ 31-35, Ex. C at 10-11, 23, at Ex. 1). The records further reveal

that the City's Police Department sold Ramadan-themed shirts bearing the official department emblem, and that the Mayor issued an Iftar invitation to select members of the community using his official City email, with the City spending public funds ($360) on signage and printing for that religious event. (*Id.* ¶¶ 36-38, Ex. C at 29-30, 32-45). The Police Department also lights its building green to celebrate Ramadan, as the City's Chief of Police has announced on social media, stating, in relevant part:

> This Ramadan, I extend my warmest greetings to all observing this sacred month of fasting, prayer, reflection, and community. May Allah bless you and your loved ones with peace, health, happiness, and abundant blessings. May this holy month bring strength, compassion, and unity to our entire community.
>
> In recognition of Ramadan—and as we do for many meaningful holidays—the exterior lighting of the Dearborn Police Department will shine green throughout the remainder of the holy month.

(Cleveland Decl. ¶ 42, at Ex. 1; *see also* Jasser Decl. ¶ 28 at Ex. 2). Iftar is the meal eaten by Muslims to break the daily fast during Ramadan; observing Iftar is an Islamic religious exercise. (Jasser Decl. ¶¶ 18, 20 at Ex. 2).

### C. Plaintiff's Repeated Requests for Equal Treatment.

On April 6, 2025, with Easter two weeks away, Plaintiff emailed then-City Attorney Jeremy Romer under the subject line "[c]onfirmation of viewpoint neutrality," asking the City to confirm that it would likewise display signs and park decorations recognizing Easter and Passover, and explaining that she "much

prefer[red] to ensure equality of faith traditions, as opposed to a challenge to the display." No one from the City responded. (Cleveland Decl. ¶¶ 28-30, Ex. A at 2, at Ex. 1).

On September 24, 2025, Plaintiff's counsel wrote to the Mayor and the City Attorney, objecting that "the City of Dearborn has become a hostile place for Christians and Jews," that the City's "singular celebration of Ramadan" was "one factor fueling this hostility," and requesting that the City "display at the appropriate time banners similar in size and content to the Ramadan banners that recognize the holy days of Christians and Jews, such as . . . Easter, Rosh Hashanah, and Yom Kippur." The City Attorney never responded. (Cleveland Decl. ¶¶ 51-53, Ex. E at 53, at Ex. 1).

On April 14, 2026, Plaintiff addressed the City Council during public comment, recounted the City's silence, and asked the Council to fund Easter and Passover banners and add a menorah to the City's holiday display so that "Dearborn is one Dearborn where all religions are treated equally and celebrated." (Cleveland Decl. ¶ 58, at Ex. 1). The next day, she emailed each of the seven Council members individually with the same request, offering to meet "to discuss a positive way forward, as opposed to litigation." (*Id.* ¶ 59, Ex. G at 63-69). Plaintiff later wrote the City's attorneys and every Council member offering to meet without her counsel;

Plaintiff's counsel confirmed in writing that the City's officials could speak with her directly. No one responded. (*Id.* ¶¶ 61-62, Ex. H at 71-73).

On May 19, 2026, after the City's budget discussion revealed a surplus, Plaintiff again asked the City Council to appropriate a small amount of the surplus to fund banners to celebrate Easter and Passover and a Menorah for the Peace Park, similar to how the City currently and in the past celebrated Ramadan. (Cleveland Decl. ¶¶ 63-64, at Ex. 1). No one responded. (*Id.* ¶¶ 63-64). On or about May 20, 2026, the City Council passed the annual budget without allocating any funds for Easter or Passover banners or displays. (*Id.* ¶ 65).

### D. The Mayor's Hostility Toward Christian and Jewish Residents.

At a September 9, 2025 City Council meeting, Ted Barham, a Christian pastor and Dearborn resident, objected to the renaming of a City street in honor of Osama Siblani, quoting Christian scripture for the proposition that "the one who lives by the sword will die by the sword" and Jesus's words that "blessed are the peacemakers." Barham explained that naming a street after Siblani was like naming a street Hamas or Hezbollah, given Siblani's public comments supporting both terrorist organizations. (Cleveland Decl. ¶¶ 44-45, at Ex. 1). The Mayor publicly chastised Barham, stating: "[Y]ou are a bigot and you are a racist and you are an Islamophobe. And although you live here, I want you to know as mayor, you are not welcome here. And the day you move out of the city will be the day that I launch a parade

celebrating the fact that you moved out of the city." (*Id.* ¶ 46). By contrast, the Mayor did not tell participants at a 2024 rally in the City who chanted "Death to America" and "Death to Israel" that they were unwelcome. The Mayor also celebrated the renaming of the street in Mr. Siblani's honor. (*Id.* ¶¶ 47-48). On October 7, 2023, the day of Hamas's terrorist attack on Israeli civilians, the Mayor posted on X, not a condemnation of the attack, but the statement that "Israel's decades of illegal military occupation and imprisonment of Gaza make peace impossible and tragic violence inevitable." (*Id.* ¶ 49). More recently, the Mayor publicly invited a performer known for antisemitic rhetoric and imagery to give a free, City-sponsored concert in Dearborn after other venues had refused to host him. (*Id.* ¶ 50).

**E. The City Expands Its Promotion of Ramadan.**

Rather than extend equal recognition to Christians and Jews, the City increased its promotion of Islam. As the *Religion News Service* reported on February 24, 2026, the City commissioned crescent moon and star lights to display on municipal street lights for Ramadan 2026, describing the program as "the first of its kind in Dearborn." (Cleveland Decl. ¶ 54, Ex. F at 59, at Ex. 1). The Mayor described the City-sponsored display as an "initiative [that] reflects who we are as a city." (*Id.* ¶ 55, Ex. F at 59). These displays were erected on City-owned property, using City funds, and coordinated by City officials, including the Mayor. (*Id.* ¶ 56). The City thus spent additional public funds of approximately $550 for each lighted crescent

moon display erected on city light poles, beyond its 2025 expenditures. (*Id.* ¶ 57, Ex. C at 26). The City has never commissioned a comparable City-sponsored street light, banner, or park display to mark any Jewish holy day, such as Passover, Rosh Hashanah, or Yom Kippur. And in 1984 the City stopped displaying a standalone crèche on City property after a federal judge ordered it removed within 48 hours, in a lawsuit challenging the solitary religious display on Establishment Clause grounds. (*Id.* ¶¶ 40, 66). The City instead erects winter lighting displays "to create a festive and welcoming atmosphere for residents, visitors, and businesses during the holiday season,"[1] with events secular in nature, such as a lighted tree and "Photos with Santa."[2] (*Id.* ¶¶ 67-68, Ex. I at 78, Ex. J at 81).

Defendants intend to continue their promotion of Islam and the religious celebration of Ramadan into the future. (*Id.* ¶ 70).

## ARGUMENT

### I. Standard for Issuing a Preliminary Injunction.

The standard for issuing a preliminary injunction is well established:

> In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of

---

[1] The City's seasonal winter "holiday display" in the Peace Park runs from around Thanksgiving until after the New Year and, upon information and belief, in the past has included no stand-alone religious symbols. (Cleveland Decl. ¶ 67, Ex. I at 78). A holiday tree "is not itself a religious symbol." *Allegheny*, 492 U.S. at 616.

[2] (*See* https://dearborn.gov/Explore/Events/wanderlights [last visited Nov. 10, 2026]; https://dearborn.gov/dearborn-shines-bright-holiday-season-mi-bright-lights-and-dearborn-wanderlights [last visited Nov. 10, 2026]).

> success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (same). Because this case concerns a violation of Plaintiff's constitutional rights, including those protected by the First Amendment, the crucial and often dispositive factor is whether Plaintiff is likely to prevail on the merits. *Connection Distrib. Co.*, 154 F.3d at 288.

## II. Plaintiff Satisfies the Standards for Granting the Requested Injunction.

### A. Plaintiff Is Likely to Succeed on the Merits of Her Establishment Clause Claim.[3]

#### 1. The Establishment Clause forbids the government from officially preferring one religion over others.

The Supreme Court unanimously affirmed last year that the Establishment Clause requires that the "government maintain 'neutrality between religion and

---

[3] As an initial matter, Plaintiff has standing in this case. Plaintiff is a municipal taxpayer who objects to her taxes being used by Defendants to inequitably fund Islamic symbols, displays, and celebrations. "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate." *Frothingham v. Mellon*, 262 U.S. 447, 486 (1923); *see also Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197 (6th Cir. 2011) (*en banc*) ("Plaintiffs seeking to establish municipal-taxpayer standing are required to meet a less rigorous injury standard than those seeking standing as federal or state taxpayers. Unlike federal or state taxpayers, municipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds."); *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278 (6th Cir. 2009); *Hawley v. City of Cleveland*, 773 F.2d 736, 741-42 (6th Cir. 1985).

religion.'" *Catholic Charities*, 605 U.S. at 254 (quoting *Epperson*, 393 U.S. at 104). The Court explained: "'The clearest command of the Establishment Clause' is that the government may not 'officially prefe[r]' one religious denomination over another. . . . This principle of denominational neutrality bars States from passing laws that 'aid or oppose' particular religions . . . or interfere in the 'competition between sects.'" *Id.* at 247-48 (cleaned up) (quoting *Larson*, 456 U.S. at 244; *Epperson*, 393 U.S. at 106). That command is rooted in the Founders' own experience: "Before the Revolution, religious establishments of differing denominations were common throughout the Colonies," and the Framers understood that "the fullest realization of true religious liberty requires that government . . . effect no favoritism among sects." *Larson*, 456 U.S. at 244, 245-46 (citation omitted); *see also Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").

When the government establishes a denominational preference, "courts must treat the law as suspect and apply strict scrutiny in adjudging its constitutionality." *Catholic Charities*, 605 U.S. at 248 (cleaned up) (quoting *Larson*, 456 U.S. at 246). The Supreme Court's rejection of the *Lemon* test in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), does not alter this rule. *Catholic Charities* was decided

three years after *Kennedy* and applied the denominational-neutrality principle and strict scrutiny without any suggestion that *Kennedy* had displaced them. *See* 605 U.S. at 247-50.[4]

**2. Defendants' promotion of Islam and Ramadan is official religious favoritism.**

The City's Ramadan displays and celebrations are the City's own religious expression. The City selected, purchased, and erected the banners and the crescent-moon display on City property using public funds; it commissioned the crescent moon and star street light displays on municipal street lights; the City Police Department lighted its building green with the express purpose of promoting Ramadan and sold Ramadan-themed apparel; and the Mayor issued the Iftar invitation from his official City email, with the City paying for the associated signage and printing. When a government entity "accept[s]" and displays a message on its property, it is engaging in government speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470-72 (2009). And while the government may speak for itself, "government speech must comport with the Establishment Clause." *Id.* at 468; *see also Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (O'Connor, J.) ("[T]here

[4] The prohibition on denominational preference is also "inextricably connected with the continuing vitality of the Free Exercise Clause," because "the fullest realization of true religious liberty requires that government refrain from favoritism among sects." *Catholic Charities*, 605 U.S. at 248 (cleaned up).

is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.”).

There is nothing neutral about the City’s speech here. The banners proclaim “Ramadan Kareem”—“Generous Ramadan”—and celebrate an Islamic holy month of fasting and prayer that commemorates the revelation of the Qur’an. The crescent moon is an Islamic religious symbol. The Iftar is an Islamic religious exercise. The City even lights its police building expressly to mark the holy month. These are not secular seasonal decorations; they are the City’s official celebration of a specific religion’s holy observances. And the City has extended that official recognition to one religion only. It has never celebrated Jewish religious holy days and long ago ceased to celebrate the religious aspect of Christmas with a standalone crèche.

The City’s Ramadan displays also lack any secular meaning. Unlike Christmas, which the Supreme Court has long recognized as a national holiday with a secular dimension, *Lynch v. Donnelly*, 465 U.S. 668, 680, 686 (1984); *Allegheny*, 492 U.S. at 616, Ramadan is not a civic or national holiday. It exists only as a religious observance, a month of fasting and prayer that commemorates the revelation of the Qur’an. The City’s banners do not offer a generic seasonal greeting; they proclaim “Ramadan Kareem,” a religious blessing on the holy month. The crescent moon is a religious symbol of Islam, not a secular emblem of a season. The

displays celebrate Islam and no other religion. And unlike the century-old memorial in *American Legion*, they have acquired no secular, commemorative meaning over time. No reasonable observer could understand them as anything other than the City's celebration of an Islamic holy month.

Indeed, the City's preference is not the product of oversight. The City refused every request to celebrate other religions equally, and it then did the opposite: it *expanded* its Ramadan promotion with new City-commissioned street light displays, an initiative the Mayor proclaimed "reflects who we are as a city." Then, despite a budget surplus, the City adopted a budget that provided nothing for any Christian or Jewish religious observance. The City has thus "cho[sen] sides" in the "competition between sects," *Catholic Charities*, 605 U.S. at 248 (cleaned up), announcing through its own displays and its own Mayor that one faith, and one faith alone, "reflects who we are as a city."

This official preference sends the message the Establishment Clause has long been understood to forbid: that non-Muslim residents such as Plaintiff are "outsiders, not full members of the political community," while adherents of Islam are "insiders, favored members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (cleaned up); *see also Catholic Charities*, 605 U.S. at 248 (quoting *Santa Fe*, 530 U.S. at 309). The Supreme Court in *Allegheny* drew precisely this line, explaining that the government "may not demonstrate a

preference for one particular sect or creed." 492 U.S. at 605. Under any test, the City's exclusive celebration of Ramadan, coupled with its refusal to recognize any Christian or Jewish holy days, is a denominational preference.[5]

**3. Defendants' hostility toward Christian and Jewish residents confirms the City's preference.**

The context in which the City's promotion of Ramadan (and thus Islam) operates removes any doubt about its non-neutral character. The government

[5] *Kennedy* did not expressly overrule *Allegheny*, which struck down a stand-alone religious holiday display and held that government "may not demonstrate a preference for one particular sect or creed." 492 U.S. at 605. Nor did *Kennedy* displace *Larson*; to the contrary, three years after *Kennedy*, a unanimous Supreme Court reaffirmed *Larson*'s command of denominational neutrality and its requirement of strict scrutiny. *Catholic Charities*, 605 U.S. at 247-48. Other circuits have likewise refused to treat Supreme Court precedent as abrogated merely because it predates or relied in part on *Lemon*. *See, e.g.*, *Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 102 (2d Cir. 2022) (holding that the Supreme Court's precedent "remains good law notwithstanding its reliance . . . on *Lemon*"); *Childs v. Webster*, 168 F.4th 1020, 1029-30 (7th Cir. 2026) (explaining that despite being "grounded in the now-abrogated *Lemon* approach," "[u]nless and until expressly overruled, [the] *Cutter* [*v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005),] rule controls"). This Court is bound by *Allegheny*, *Larson*, and *Catholic Charities*, and those decisions control here. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *accord Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.") (quoting *Rodriguez de Quijas*). *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 590-91 (5th Cir. 2026) (en banc), *petition for cert. filed*, No. 26-257 (U.S. Aug. 17, 2026), does not change this. *Allegheny*'s rule against denominational preference (492 U.S. at 605) rests on *Larson*, not *Lemon*, and *Catholic Charities* reaffirmed *Larson* in 2025. Taxpayer-funded support of one faith is itself a historic prohibition that pre-dates *Lemon*.

"cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018). "[T]he First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). And official expressions of hostility by those responsible for government action are relevant evidence of a departure from neutrality. *See Masterpiece Cakeshop*, 584 U.S. at 639.

Here, the City's Mayor—its chief executive and final policymaker, who coordinated Ramadan celebrations—told a Christian pastor who invoked Christian scripture at a public meeting that he was "not welcome here" as a resident and that the Mayor would "launch a parade" on the day he moved out of the City. The Mayor extended no comparable rebuke to rally participants in the City who chanted "Death to America" and "Death to Israel." This record confirms that the City's singular celebration of Ramadan is not an inclusive acknowledgment of the City's diverse religious community, but an official preference for one faith. Moreover, the Mayor condemned the Christian pastor based on the latter's criticism of Islam, cementing the City's favoritism to Muslims.

The Mayor has likewise displayed hostility toward the City's Jewish residents. On October 7, 2023—the day Hamas terrorists attacked Israeli civilians—the Mayor

did not condemn the attack. Instead, he declared on X that "Israel's decades of illegal military occupation and imprisonment of Gaza make peace impossible and tragic violence inevitable." And he has since invited a performer known for antisemitic rhetoric and imagery to perform a free, City-sponsored concert in Dearborn after other venues refused to host him. Against this backdrop, the City's refusal to recognize Passover, Rosh Hashanah, or Yom Kippur—while celebrating Ramadan with City banners, City lights, and City money—cannot be dismissed as an oversight.

#### 4. ***Lynch*, *Allegheny*, and *American Legion* establish that Defendants' promotion of Ramadan is unconstitutional.**

The Supreme Court's government-display precedents establish the City's displays celebrating Ramadan are unconstitutional. The Court has never upheld a government display that honored a single faith's religious holy day standing alone and has only upheld religious displays that have a long-standing history and tradition.[6]

For instance, in *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Court upheld a city's inclusion of a crèche in its annual Christmas display. But the Court did so only

---

[6] *Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753 (1995), is not to the contrary. There, the Court held that the State could not exclude a *private* group's unattended cross from a traditional public forum; the display was "private expression," not the government's own. *Id.* at 760. Here, by contrast, the City itself selected, purchased, erected, and paid for the Ramadan displays.

because the crèche was one element of a display located in the city's shopping district that included a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures of a clown, an elephant, and a teddy bear, hundreds of colored lights, and a large banner reading "SEASONS GREETINGS." *Id.* at 671. The Court insisted that the crèche be viewed "in the context of the Christmas season," *id.* at 679-80, including the long-standing recognition of Christmas as a national holiday, *id.* at 675-76, 680, 686. Critically, *Lynch* reaffirmed that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.* at 673.

None of the features that saved the display in *Lynch* is present here. Ramadan is not a national holiday; the City's banners, crescent moon, and street light displays are not part of a long-standing national observance of a holiday that holds both religious and secular recognition; and the City has met requests to recognize other faiths not with accommodation, but with silence and an expanded promotion of Ramadan.

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989), is also instructive. Here, the Court struck down a crèche displayed alone on the Grand Staircase of the county courthouse with a banner proclaiming "Gloria in Excelsis Deo," holding that, unlike in *Lynch*, "nothing in the context of the display detracts from the crèche's religious message." *Id.* at 598; *see id.* at 598-602. At the same time, the Court upheld an 18-

foot Chanukah menorah displayed outside the City-County Building, but only because it stood beside a 45-foot Christmas tree and a sign saluting liberty, such that the combined display recognized that "both Christmas and Chanukah are part of the same winter-holiday season, *which has attained a secular status in our society*." *Id.* at 616 (emphasis added); *see id.* at 613-21 (opinion of Blackmun, J.); *id.* at 632-37 (O'Connor, J., concurring in part and concurring in the judgment). Central to that holding was the Court's conclusion that "[t]he Christmas tree, unlike the menorah, is not itself a religious symbol." *Id.* at 616 (opinion of Blackmun, J.); *see id.* at 633-35 (O'Connor, J., concurring in part and concurring in the judgment). And it was the "secular status" the winter-holiday season had attained that led the Court to uphold symbols of that season, namely the menorah and tree. The Court made clear the principle on which both holdings rested: whatever else the Establishment Clause means, "it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed . . . ." *Id.* at 605.

Even the Justices who would have upheld both displays in *Allegheny*—whose history-focused approach the Court has since embraced, *see Kennedy*, 597 U.S. at 534-36—recognized the limit the City has crossed here. Justice Kennedy explained that the Establishment Clause would forbid a city "to permit the permanent erection of a large Latin cross on the roof of city hall . . . because such an obtrusive year-round religious display would place the government's weight behind an obvious

effort to proselytize on behalf of a particular religion." *Allegheny*, 492 U.S. at 661 (Kennedy, J., concurring in the judgment in part and dissenting in part). The Defendants' city-wide, multi-prong, and month-long taxpayer-funded promotion of Ramadan places the government's weight squarely behind one religion—Islam.

The Court's holding in *American Legion v. American Humanist Ass'n*, 588 U.S. 29 (2019), further illustrates the unconstitutionality of Defendants' displays. There, the Court upheld the Bladensburg Peace Cross, a World War I memorial that had stood on public land for nearly a century. The Court's holding rested entirely on history and the passage of time. It explained that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones," and that "[t]he passage of time gives rise to a strong presumption of constitutionality." *Id.* at 57. The Court identified the considerations that justified that presumption: the original purposes of a longstanding monument may be lost or unknowable; such monuments often come to serve multiple, secular purposes, such as commemoration; their message may evolve as they become embedded in a community's identity; and removing a familiar, longstanding monument may itself appear hostile to religion. *Id.* at 51-57. The Court also emphasized that there was no evidence of discriminatory intent in the selection of the memorial's design or in the decision to maintain it. *Id.* at 60.

The history and tradition on which *American Legion* depended are entirely lacking here. The City's Ramadan symbols are not established monuments; they are recurring, taxpayer-funded displays first introduced in 2025 and expanded in 2026 with street light displays the City itself described as "the first of its kind in Dearborn." There is no "passage of time" to give rise to any presumption of constitutionality, and no forgotten original purpose—the banners announce their purpose on their face: "Ramadan Kareem." The displays have acquired no secular, commemorative meaning; they exist to celebrate a religious observance during that observance. They are not embedded in the community's identity—Plaintiff objected the very first season she encountered them. Removing them would not convey hostility to religion; it would restore the neutrality the Constitution requires. And unlike in *American Legion*, the record here contains direct evidence of non-neutral treatment: the City's refusal of every request to recognize Christian and Jewish holy days, its expansion of its promotion of Ramadan in the face of those requests, and the Mayor's statement to a Christian resident that he was "not welcome here." *American Legion* protects longstanding monuments from being torn down; it provides no license for a city to purchase and erect religious displays honoring one faith alone.

### 5. Defendants' promotion of Ramadan does not fit within any historical tradition.

Under *Kennedy*, "the Establishment Clause must be interpreted by reference to historical practices and understandings," and "[t]he line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." 597 U.S. at 535-36 (cleaned up) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576-77 (2014)). The City's promotion of Ramadan fails this test for at least two reasons, in addition to those discussed above.

*First*, at the Founding, two primary concerns animated the Establishment Clause: (1) religious coercion and (2) official preference for some denominations over others. Coercion "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537. And among the other recognized concerns was the government's use of public funds to financially support the favored religion. *See Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring in the judgment) (identifying, among the "hallmarks" of founding-era religious establishments, "financial support for the established church"). The prohibition on compelled financial support for religion was central to the views of Madison and Jefferson, whose writings the Supreme Court has repeatedly consulted in construing the Clause. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 11-13 (1947). As the Court put

it: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Id.* at 16. Madison warned that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 3 (1785), *reprinted in Everson*, 330 U.S. at 65-66 (appendix to opinion of Rutledge, J., dissenting). The City's use of taxpayer money to purchase and display religious symbols of one faith and to host that faith's religious meal cannot be reconciled with these founding-era principles.

*Second*, whatever historical tradition exists for governmental recognition of religious holy days is a tradition of inclusion and nondiscrimination—not exclusive favoritism. In upholding legislative prayer, for example, the Supreme Court emphasized that the town had not excluded or denied an opportunity to any faith and explained that "[s]o long as the town maintains a policy of nondiscrimination," the Constitution does not require it to search beyond its borders for prayer givers of other faiths. *Town of Greece*, 572 U.S. at 585-86. The City has adopted the opposite policy. It has refused, repeatedly and in the face of direct requests, to extend any recognition to the holy days of Christians and Jews. No historical tradition sanctions

a government's exclusive celebration of one faith's holy days while rejecting equal recognition for others.

**6. Defendants' promotion of Ramadan fails strict scrutiny.**

Because Defendants' promotion of Ramadan establishes a denominational preference, it is subject to strict scrutiny, and Defendants bear the burden of demonstrating that it is narrowly tailored to serve a compelling governmental interest. *Larson*, 456 U.S. at 246-47; *Catholic Charities*, 605 U.S. at 248. Strict scrutiny is the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Defendants cannot meet it.

Defendants have no compelling interest in celebrating the holy days of one religion while refusing to recognize the holy days of others. To the extent the City asserts an interest in welcoming or acknowledging its Muslim residents, that interest cannot justify the City's selective use of standalone religious symbols and religious observance to express official solidarity with one faith to the exclusion of all others. The City's interest, whatever it may be, also could be served by means that do not prefer one religion over others—most obviously, by treating all faiths equally, as Plaintiff has asked for more than a year, or by not sponsoring religious displays at all. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021).

The City's refusal to adopt any neutral alternative—and its decision instead to expand its promotion of Ramadan—is fatal under strict scrutiny.[7]

### B. Plaintiff Is Likely to Succeed on the Merits of Her Equal Protection Claim.

The Equal Protection Clause "embodies the principle that all persons similarly situated should be treated alike." *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019) (citation omitted). Government action that disadvantages a suspect class or impinges upon the exercise of a fundamental right is presumptively invidious and will be sustained only if it is "suitably tailored to serve a compelling state interest." *Id.* at 1085-86 (citation omitted); *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 256 (6th Cir. 2015) (*en banc*) (holding that when "disparate treatment . . . burdens a fundamental right," such treatment violates the Fourteenth Amendment) (cleaned up). Religion is among the "inherently suspect distinctions" that trigger strict scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). And the free exercise of religion is a fundamental right. The City's promotion of Islam and Ramadan fails on both counts.

[7] Plaintiff has consistently sought equal treatment. But the constitutional violation lies in the City's official preference for one faith, and Defendants have rejected every request to cure it. The requested injunction is the most direct and least intrusive means by which the Court can halt that preference pending a final judgment, and it leaves the City free to propose a neutral policy that treats all faiths equally.

**1. Defendants' disparate treatment based on religion.**

The City has drawn a line based on religion. On one side are Muslim residents, whose holy month the City celebrates with standalone religious displays, including City banners, a City purchased crescent moon in the City's park, crescent moon and star displays on City street lights, a police building lit for the occasion, an Iftar hosted by the Mayor and funded in part with public funds, and the selling of Ramadan-themed apparel by the City police department. On the other side are Christian and Jewish residents such as Plaintiff, whose faith and holy days receive no comparable recognition. Plaintiff is similarly situated in every relevant respect to the residents whose faith the City celebrates: she is a Dearborn resident and taxpayer who asked the City to extend to her faith's holy days and those of her Jewish neighbors, the same recognition the City extends to Ramadan. The City refused.

The Sixth Circuit has recognized that this type of disparate treatment of religious observances creates an equal protection violation. In *Maye*, a prison chaplain permitted adherents of one Islamic sect to observe the holy day of Eid while denying that same opportunity to an adherent of another sect. 915 F.3d at 1085-86. The court held that the chaplain had made a conscious decision to treat religious adherents differently based on their faith, that the plaintiff was similarly situated to those permitted to celebrate, and that, because the distinction burdened a fundamental right, the plaintiff had stated an equal protection claim. *Id.* The

Supreme Court has long held the same. In *Niemotko v. Maryland*, 340 U.S. 268 (1951), and *Fowler v. Rhode Island*, 345 U.S. 67, 69-70 (1953), the Court invalidated municipal decisions that allowed some religious groups, but not Jehovah's Witnesses, to use public parks for religious purposes, explaining that "[t]he right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko*, 340 U.S. at 272. As the Supreme Court explained in *Fowler*, treating one religious group's observance as permissible while denying the same treatment to another "is merely an indirect way of preferring one religion over another." 345 U.S. at 70. The City's refusal to extend to Christian and Jewish holy days the recognition it gives Ramadan is no different.

The record also establishes discriminatory purpose. Whether a government decision was motivated by a discriminatory purpose is assessed by examining, among other things, the impact of the decision, its historical background, "[t]he specific sequence of events leading up to the challenged decision," departures from normal procedures, and contemporaneous statements by decisionmakers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Each factor points the same way here. The impact falls entirely on non-Muslim residents. The historical background includes repeated federal litigation over the treatment of

Christians within the City. *See Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011); *Bible Believers*, 805 F.3d 228 (en banc). The sequence of events is telling: after Plaintiff asked for equal treatment, the City ignored her, directed its officials not to speak with her, *expanded* its Ramadan displays, and then adopted a budget with a surplus but no funding for any Christian or Jewish observance. And the City's mayor told a Christian resident who invoked Christian scripture that he was "not welcome here," while proclaiming that the City's promotion of Ramadan "reflects who we are as a city." The City acted not "in spite of" its unequal treatment of Christians and Jews, but with full knowledge of it and in the face of repeated requests to correct it. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Nor may Defendants avoid equal protection scrutiny by characterizing their displays as government speech. The government speech doctrine means only that the government's own expression is not subject to the Free Speech Clause; it does not exempt the government from the Constitution's other commands. *See Summum*, 555 U.S. at 467-68 (government speech "must comport with the Establishment Clause"). Plaintiff does not challenge the City's right to speak. She challenges the City's allocation of public property, public personnel, and public funds on the basis of religion, which the Equal Protection Clause forbids.

#### 2. Defendants' religious discrimination cannot survive strict scrutiny.

Because Defendants' promotion of Ramadan classifies on the basis of religion and burdens a fundamental right, it is subject to strict scrutiny. *Maye*, 915 F.3d at 1085-86; *Dukes*, 427 U.S. at 303. For the reasons set forth above, Defendants have no compelling interest in the religious celebration of the holy days of one faith—which hold no secular meaning—while refusing to recognize those of others, and their practice of promoting Islam is not narrowly tailored to any legitimate interest. Defendants could achieve any legitimate interest in recognizing the diversity of the City's residents by treating all faiths equally, as Plaintiff has asked for more than a year.

#### 3. The requested injunction is an appropriate remedy for Defendants' unequal treatment.

When the government confers a benefit on one group and denies it to another on an impermissible basis, the discrimination itself is a cognizable injury, and "the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 465 U.S. at 740 (citation omitted); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 73-74 (2017). Plaintiff has asked for equal treatment—the extension of recognition to Christian and Jewish holy days—for more than a year, and the City has refused. Pending a final judgment,

the most appropriate and least intrusive way to restore equal treatment is to enjoin Defendants from continuing to use public property and public funds to celebrate Islam and its religious holy days. Such an injunction leaves Defendants free to propose a policy that treats all faiths equally.

**C. Irreparable Harm to Plaintiff.**

Plaintiff will be irreparably harmed without the requested injunction. As stated by the Sixth Circuit, "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo,* 241 F.3d 800, 809 (6th Cir. 2001). Because *Bonnell*'s rule applies to any "constitutional right," it applies as well to Plaintiff's right to the equal protection of the laws. *See also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (stating in an Equal Protection case that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed").

Further, it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *Connection Distrib. Co.*, 154 F.3d at 288; *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 449 (6th Cir. 2010) (finding, in an Establishment Clause case, that "[p]laintiffs have established that they suffered a constitutional violation and will suffer continuing irreparable injury if the violation continues");

*Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (finding irreparable harm in an Establishment Clause case and noting that "[w]hen a public entity's religious display violates the Establishment Clause, the public entity sends a message indicating that the authority of the State stands behind a particular religious viewpoint [and that t]his message, whether subtle or overt, is impermissible"). And this injury is sufficient to justify the requested injunctive relief. *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*).

The harm here is concrete and imminent. Ramadan 2027 is expected to begin on or about February 8, 2027. Defendants have displayed City-funded Ramadan banners and a crescent moon display, expanded their promotion of Ramadan with new street light displays in 2026, looked to purchase two more crescent moon displays at approximately $11,000 each, and intend to continue the promotion of Ramadan/Islam into the future. Absent an injunction, Plaintiff will again be confronted in her own community with the City's official celebration of one faith, and her tax dollars will again be spent on that celebration—injuries that no award at the end of this litigation can undo.

**D. Harm to Others.**

The likelihood of harm to Plaintiff is substantial because the deprivation of her constitutional rights, even for minimal periods, constitutes irreparable injury. *See supra*. On the other hand, if Defendants are restrained from using City property and public funds to celebrate Islam or Ramadan, they will suffer no cognizable harm, because the government has no legitimate interest in conduct that violates the Constitution. *See Connection Distrib. Co.*, 154 F.3d at 288. Nor will the requested injunction harm any third party. It does not restrict any private person's religious exercise or expression in any way. Dearborn's Muslim residents, mosques, and community organizations remain entirely free to celebrate Ramadan as they see fit, including through private displays. The injunction restrains only the *City's* use of *its* property and *public* funds to prefer one religion. Because Plaintiff has shown that a violation is likely, the balance of harms tips decidedly in her favor.

In the final analysis, the question of harm to others as well as the impact on the public interest "generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation." *Connection Distrib. Co.*, 154 F.3d at 288. For if Plaintiff shows that her constitutional rights have been violated, then the harm to others is inconsequential. *See also Baker*, 310 F.3d at 930 (finding irreparable harm in an Establishment Clause case and noting that the government's violation sends a public "message indicating that the authority

of the State stands behind a particular religious viewpoint [and that t]his message, whether subtle or overt, is impermissible”).

**E. The Public Interest.**

The impact of the preliminary injunction on the public interest turns in large part on whether Defendants violated Plaintiff’s constitutional rights. As the Sixth Circuit has noted, “it is always in the public interest to prevent the violation of a party’s constitutional rights.” *G & V Lounge, Inc. v. Mich. Liquor Control Comm’n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that “the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties”).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion and preliminarily enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them, from using City property, City resources, or public funds to display, celebrate, or promote Islam or Ramadan, or to purchase additional Islamic religious displays, as set forth in the motion, pending a final judgment in this case.[8]

---

[8] The Court should waive the Rule 65(c) security requirement. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court has discretion to require no bond). This non-commercial civil rights action seeks to

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
Kate Oliveri, Esq. (P79932)
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq.
6218 Georgia Avenue NW, Suite 1 No. 403
Washington, DC 20006
Tel: (646) 262-0500; Fax: (801) 760-3901
dyerushalmi@americanfreedomlawcenter.org

*Attorneys for Plaintiff*

---

vindicate constitutional rights, and the injunction will cause Defendants no monetary loss. It will in fact save public funds.

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system. Parties may access this filing through the court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: [None].

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq.